UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARK W. DOBRONSKI,

                              Civil Action No. 25-10169
                    Plaintiff,

                              Nancy G. Edmunds
v.                            United States District Judge

ALEXIS FRANCIS DARAUJO,       David R. Grand
UNITED OF OMAHA LIFE          United States Magistrate Judge
INSURANCE COMPANY, AND DOE
TELEMARKETER,

                    Defendants.
_____/

## REPORT AND RECOMMENDATION TO GRANT IN PART AND DENY IN PART DEFENDANTS' MOTIONS TO DISMISS (ECF Nos. 21, 29)

Plaintiff Mark Dobronski claims that defendants United of Omaha Life Insurance Company ("Omaha"), Alexis Daraujo ("Daraujo"), and a John Doe "Telemarketer" are responsible for over a dozen telemarketing calls to his residential phone number that violated federal and state law.[1]  He seeks damages for those calls under federal and state law, including treble damages under the Telephone Consumer Protection Act of 1991 ("TCPA").  Omaha and Daraujo have filed motions to dismiss (ECF Nos. 21, 29[2]).  For the

---

[1] Pursuant to 28 U.S.C. § 636(b)(1), this case has been referred to the undersigned for all pretrial proceedings, including a Report and Recommendation on all dispositive motions.  (ECF No. 13).

[2] As with her previous motions, Daraujo failed to comply with Local Rule 7.1(a)'s requirement that before filing a motion, the movant "must confer with the other parties and other persons entitled to be heard on the motion in good faith and in a manner that reasonably explains the basis for the motion and allows for an interactive process aimed at reaching agreement on the matter or those aspects of the matter that can be resolved without court intervention, given the nature of the contemplated motion."  E.D. Mich. LR 7.1(a)(1).  While the Court has previously warned Daraujo about failing to adhere to this requirement (ECF Nos. 14, 18, 26), because Omaha's similar motion

following reasons, the motions should be granted to the extent they seek dismissal of Dobronski's TCPA claims for treble damages, and should otherwise be denied.

## I.     FACTUAL BACKGROUND

Dobronski alleges that his residential telephone number "ha[s] been besieged with telemarketing calls hawking such things as alarm systems, Google listings, automobile warranties, health insurance, life insurance, credit cards, and even financial miracles from God."[3]  (ECF No. 20, First Amended Complaint ("FAC") ¶ 36).  To reduce the number of unsolicited telemarketing calls he receives to that number, he has listed the number on the federal government's national do-not-call registry which puts telemarketers on notice not to call the number.

Notwithstanding that fact, Dobronski alleges that he received calls to that number soliciting "[f]inal expense insurance, sometimes called funeral insurance or burial insurance," offered by Omaha.  (*Id.* ¶ 68).  The putative agent for such insurance was Daraujo, who is a licensed insurance agent in Michigan.  And, Omaha allegedly "engage[d]" third-party telemarketers to solicit its insurance products.  (*Id.* ¶ 76).

Dobronski alleges that Omaha sells its insurance products in a manner that is misleading at best and fraudulent at worst.  Telemarketers "initiate telephone calls *en masse* using automated telephone dialing systems."  (*Id.* ¶ 77).  Once someone picks up, the

---

is properly before the Court, and for efficiency's sake, the Court will accept Daraujo's motion. However, the Court again warns her that future motions that do not comply with the Local Rule will be stricken.

[3] Dobronski claims his residential telephone line is "assigned to a service for which [he] is charged for the call on a per call and a per minute basis." (FAC ¶ 38).

telemarketers "falsely represent that they are licensed insurance agents" and solicit sales of Omaha's insurance products. (*Id.* ¶ 82). If a person is interested, then a telemarketer "access[es] [Omaha's] computer systems" and "submit[s] [the] prospective insurance application[] directly to Omaha in Daraujo's name." (*Id.* ¶ 83).

Dobronski alleges that Omaha "knew (or reasonable [sic] should have known) of the overall scheme and that the insurance applications being received from their authorized agents, such as Daraujo, have been obtained through the use of unlawful telemarketing methods." (*Id.* ¶ 92). Yet "Omaha elects to consciously disregard or engage in wilful [sic] blindness to said illegal conduct due to the financial benefits which [it] reaps from the same." (*Id.*).

Dobronski alleges that he received several calls that he claims stemmed from Omaha's unlawful marketing scheme. When Dobronski received the first such call, he executed a scheme of his own: a so-called "canary trap." (*Id.* ¶ 97). In a canary-trap scheme, the canary trapper answers a telemarketing call, pretends to be interested in whatever the caller is selling, and gives the caller a unique, fake name. Then, if someone calls back later and uses the fake name, the trapper can prove both calls are connected.

Dobronski "canary traps" telemarketers "to ascertain the true identity of the source of an unsolicited telemarketing call" in the hopes that he can stop such calls from coming. (*Id.* ¶ 96). And he accomplishes this by making do-not-call requests to the individual or entity responsible for the calls, or else by suing such person; Dobronski often resorts to the second option, and is a frequent plaintiff in this Court.

Dobronski alleges that from January through May 2025 he received fourteen calls

3

to his residential phone number that he claims were connected to Omaha's marketing scheme. Because of these calls, Dobronski says, he "suffered the injury of invasion of privacy and intrusion on [his] right of seclusion."[4]  (*Id.* ¶ 63).

Except where otherwise stated below, Dobronski received all fourteen calls from different numbers. He allegedly never gave any of the callers his residential telephone number. And after nearly all the calls he tried to call back the numbers that had called him to request that he not be called again. But his return calls either disconnected or rang unanswered. Following are details of the various calls, as alleged by Dobronski.

*Call 1.* Dobronski received the first call at 3:08 p.m. on January 9, 2025. The caller stated that he was "with Allstate Insurance Company" and solicited a final expense insurance policy. (*Id.* ¶ 100). Dobronski feigned interest and said his name was "Bruce Maxwell Carter," which was a canary-trap name that he had not used before. (*Id.* ¶ 103). Dobronski was transferred to an individual who identified himself as "Shawn Murphy with Seniors Care," and who "solicited [him] for a $20,000 final expense insurance policy issued by Omaha." (*Id.* ¶ 105). Dobronski gave more fake information, including that Bruce Carter had an account with "Old National Bank," before the call ended. (*Id.* ¶ 153).

At 3:58 p.m. on January 9th Dobronski "received an email from Omaha with a copy of an Omaha insurance application." (*Id.* ¶ 112). "The email and the application named Daraujo as the producing agent." (*Id.*). Dobronski later "received several additional emails

---

[4] Dobronski alleges that the calls also caused "the injury of occupation of [his] telephone line"; "an injury in the form of a nuisance and annoyance"; and "the injury of trespass to [his] chattel." (FAC, ¶¶ 64, 65, 66).

from Omaha with a copy of the Omaha insurance application" asking him to electronically sign the application. (*Id.* ¶ 115.) He never e-signed the application. (*Id.*). Nevertheless, about 30 minutes later, Dobronski received an e-mail from Omaha – with a copy of an insurance application – informing him that the "Omaha insurance application has been reviewed and submitted." (*Id.* ¶ 116). The application bears an e-signature of "Bruce Carter," and indicates that it was e-signed at 4:33 p.m. (*Id.*). It also includes a "producer statement" from Daraujo indicating that she "personally interviewed [Dobronski] and electronically signed the application at 4:37 p.m. (*Id.*).

*Call 2.* At 11:30 a.m. on January 13th Dobronski received a call from the same individual who had identified themselves as "Shawn Murphy" during the January 9th call. The caller asked for Bruce Carter, which is the canary-trap name that Dobronski had earlier given him. The caller "stated that the insurance company had 'reached' out to him," and the caller asked Dobronski to email copies of Bruce Carter's driver license and Social Security card to "michael@sageshieldassurance.com." (*Id.* ¶ 121).

Dobronski later researched "sage shield assurance" and discovered that the web address "sageshield.com" shows "that Daraujo is affiliated with that site." (*Id.* ¶ 124). The website also "provide[s] a contact telephone number." (*Id.*). Dobronski then called that contact number. No one picked up, so he left a message asking Daraujo to call him back.

*Call 3.* At 11:42 a.m. on January 13th the same individual who had identified himself as "Shawn Murphy" during the first two calls called Dobronski again. He wanted to know whether Dobronski had emailed Bruce Carter's driver's license and Social Security card.

5

*Call 4.* At 2:50 P.M. on January 13th Dobronski received a call from Daraujo. Daraujo did not use her full name; she identified herself as "Alexis . . . with Sageshield Assurance." (*Id.* ¶ 134). Dobronski "confronted" her about the calls he had been receiving, and she "first stated that the callers worked for her." (*Id.* ¶ 135). But after Dobronski complained that the calls had violated federal law, she "distanced herself from the callers." (*Id.*). Dobronski said he was not interested in insurance from Omaha and did not want to receive any more telemarketing calls to his residential line. Dobronski also asked her for her business address, but she refused to provide it and hung up.

*Call 5.* At 3:04 p.m. on January 13th Dobronski received another call from a caller who identified themselves as "Shawn Murphy." The caller "expressed some urgency about [Dobronski] resubmitting his application for insurance." (*Id.* ¶ 146). Dobronski responded "that he had just spoken with the agent, to which [the caller] stated she was 'just the receptionist.'" (*Id.* ¶ 146). Dobronski asked the caller for their office address, and the caller said "Florida" and hung up. (*Id.* ¶ 147).

*Call 6.* On April 7th, Dobronski received a call from an individual who said he was "with Fraud Department of Old National Bank" and asked to speak to Bruce Carter. (*Id.* ¶ 152). "Old National Bank" matched the name that Dobronski had earlier given for Bruce Carter's bank. The caller stated that potentially fraudulent charges had been flagged on Bruce Carter's bank account, and the caller asked for Carter's address and bank account number to verify the charges. Dobronski obliged by providing canary-trap information.

*Calls 7–9.* At 2:07 p.m. on April 29th Dobronski receive a call from a phone number ending in 5613. The call disconnected immediately after Dobronski answered it. At 4:57

p.m. that same day and on April 30th, Dobronski received two more calls from the same number ending in 5613.  Both those calls also disconnected after a few seconds.

*Call 10.*  On May 1st Dobronski received a call from an individual who identified herself as "Hazel with your insurance carrier" and asked for Bruce Carter.  (*Id.* ¶ 172).  The caller stated that Bruce Carter "qualified for a reduction on life insurance rates" in connection with his Omaha insurance policy.  (*Id.* ¶ 173).  The caller asked to verify Bruce Carter's information, and Dobronski told her he "was occupied at the moment."  (*Id.* ¶ 176).  The caller hung up.

*Call 11.*  On May 2nd Dobronski received a call from an individual who identified himself as "David Harrison with Mutual of Omaha" and asked for Bruce Carter.  (*Id.* ¶ 180).  The caller said that Bruce Carter was "eligible for discounted rates."  (*Id.* ¶ 181).  The caller asked for Bruce Carter's birthday, and Dobronski said he would have to call back with that information.  The caller then shouted an expletive and hung up.

*Calls 12–14.*  Later in the day on May 2nd Dobronski received three calls from a number ending in 5612.[5]  The callers who made Calls 12 and 13 hung up a few seconds after Dobronski picked up.  And the caller who made Call 14 stated, "I am looking for Bruce Carter," and then hung up.  (*Id.* ¶ 190).

## II.   PROCEDURAL HISTORY

On May 6th Dobronski filed the operative complaint in this action.  (ECF No. 20).

---

[5] The first nine digits of the number ending in 5613 that initiated Calls 12–14 matched the first nine digits of the number ending in 5612 that initiated Calls 7–9. According to Dobronski, this implies the calls "were originated by the same caller." (FAC ¶ 193).

He alleges that Omaha, Daraujo, and the Doe Telemarketer "are engaged in a concerted scheme to market final expense insurance," and that the 14 phone calls[6] discussed above give rise to Dobronski's claims for damages under federal and state law.

Dobronski's federal claims arise under the TCPA.  Subsection 227(b) of the Act restricts robocalls—calls made using "any automatic telephone dialing system or an artificial or prerecorded voice"—and instructs the FCC to issue implementing regulations.[7] 47 U.S.C. § 227(b)(1), (2).  Subsection 227(b) states that "[a] person or entity" may bring "an action based on a violation of this subsection or the regulations prescribed under this subsection."  § 227(b)(3).  Dobronski claims that Defendants violated FCC regulations promulgated under subsection 227(b) (but not subsection 227(b)'s substantive provisions).

Subsection 227(c) instructs the FCC to make rules "protect[ing] residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object."  § 227(c)(1).  Subsection 227(c) further states that "[a] person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection" may bring "an action based on a violation of the regulations prescribed under this subsection."  § 227(c)(5).  Dobronski claims that Defendants also violated regulations promulgated under subsection 227(c).

---

[6] Dobronski alleges that he "has reason to believe, and does believe, that there were additional calls initiated to [his] residential telephone number by or on behalf of the same Defendants, [at] dates and times which [he] is unable to ascertain at this time." (*Id.* ¶ 196). But Dobronski only seeks damages for Calls 1–14.

[7] Section 227(b)'s substantive provisions generally prohibit making non-emergency robocalls to certain telephone lines without the callee's express consent. *See* 47 U.S.C. § 227(b)(1)(A), (B).

Subsections 227(b) and (c) both permit a plaintiff to recover treble damages "[i]f the court finds that the defendant willfully or knowingly violated" FCC regulations issued under their provisions.   § 227(b)(3), (c)(5).   Dobronski seeks treble damages under subsections 227(b) and (c).

Dobronski also brings claims under state statutes that regulate telemarketing, including the Michigan Home Solicitation Sales Act ("MHSSA"); Michigan's Telephone Companies as Common Carriers Act; Michigan's Consumer Protection Act; and Florida's Telemarketing Sales Act.

On May 20, 2025, Omaha filed a motion to dismiss.  (ECF No. 21).  Omaha argues that the Court lacks jurisdiction over this action because Dobronski lacks Article III standing.  Omaha argues in the alternative that Dobronski fails to plead direct or vicarious liability against it, fails to plead willfulness, and fails to plead any federal or state-law claims against it.  Daraujo filed a motion to dismiss on July 21, 2025, that largely parrots Omaha's motion and asserts that Dobronski "failed to make any allegations against [her] relating to [his Florida Telemarketing Sales Act" claim."  (ECF No. 29).  Omaha's motion was fully briefed (ECF Nos. 27, 28), and Dobronski filed a response to Daraujo's motion (ECF No. 31).  The Court finds that a hearing will not aid in determining the motions' proper resolution.

## III.   ANALYSIS

Defendants argue that Dobronski lacks Article III standing, and in the alternative, that he fails to plead any claims against them.  Because Article III standing is jurisdictional, the Court addresses that issue first.

## A.    Article III Standing

"Article III of the Constitution limits the jurisdiction of the federal courts to actual cases or controversies," and "[a]n essential component of the case-or-controversy requirement is the doctrine of standing." *Dickson v. Direct Energy, LP*, 69 F.4th 338, 342 (6th Cir. 2023). "To establish [Article III] standing, plaintiffs bear the burden of showing (1) a concrete and particularized injury-in-fact which (2) is traceable to the defendant's conduct and (3) can be redressed by a favorable judicial decision." *Id.* at 343.

The elements of Article III standing "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). At the pleading stage, courts "must construe the complaint in favor of the complaining party" and evaluate whether he "clearly . . . allege[s] facts demonstrating" Article III standing. *Warth v. Seldin*, 422 U.S. 490, 501, 518 (1975).

Defendants argue that none of the telephone calls at issue inflicted any concrete and particularized injury in fact on Dobronski. But Dobronski alleges that the calls intruded upon his seclusion.[8] The "core" of intrusion upon seclusion is an interference with one's "sense of solitude in one's life and private affairs." *Dickson*, 69 F.4th at 345. And in TCPA cases, intrusion upon seclusion generally satisfies Article III's injury requirement because the Act regulates telemarketing, and "telephones are logically part of one's private domain to which the right to be left alone extends." *Id.* at 346.

---

[8] The Court need not consider whether Dobronski pleads that the calls concretely injured him in the other ways he alleges. *See generally supra* note 4.

On the face of the pleadings, Dobronski sufficiently alleges that Calls 1–14 intruded upon his seclusion.  He does not wish to receive unsolicited telemarketing calls to his residential telephone line and put that number on the national do-not-call registry.  He only feigned interest in Omaha's insurance products to find out who was responsible for the calls, so that that he could get the calls to stop.  And he asked Daraujo during Call 11 not to call him again, and tried to make do-not-call requests after most of the calls.

Defendants disagree that Dobronski suffered a cognizable injury for four reasons. *First*, they rely on *Stoops v. Wells Fargo Bank, N.A.*, 197 F. Supp. 3d 782 (W.D. Pa. 2016), and *Leyse v. Bank of America*, No. 11-7128, 2020 WL 1227410 (D.N.J. Mar. 13, 2020). In *Stoops*, the plaintiff brought TCPA claims stemming from phone calls she had received to her cell phones, which she alleged had "violated her privacy interests."  *Stoops*, 197 F. Supp. 3d at 797.  On summary judgment, the court held that the plaintiff had not suffered any concrete Article III injury because "her only purpose in using her cell phones is to file TCPA lawsuits."  *Id.* at 800.

In *Leyse*, the plaintiff worked for a lawyer whose practice focused on TCPA violations and lawsuits.  *See Leyse*, 2020 WL 1227410, at *1.  The plaintiff received an unsolicited telemarketing call from the defendant, and he later called the defendant over twenty times to tell it that its call had violated the TCPA.  *Id.* at *1–2.  He then brought TCPA claims against the defendant, with his employer as his counsel.  *Id.* at *2.  On summary judgment, the court held that he had not suffered any concrete Article III injuries such as "nuisance, annoyance, inconvenience, wasted time, [or] invasion of privacy" because he "welcomed . . . [unsolicited telemarketing] calls in his role as a paid

11

investigator aiding his counsel in the preparation of TCPA lawsuits." *Id.* at *4.

The upshot of *Stoops* and *Leyse* is that professional TCPA plaintiffs generally lack Article III standing because their receipt of telemarketing calls does not inflict any concrete Article III injury upon them.  Omaha points to other TCPA lawsuits Dobronski has filed (which it believes form part of the pleadings) and argues that he, too, is a professional TCPA plaintiff.

Even if the fact that Dobronski has filed other TCPA lawsuits in the past forms part of his pleadings, *Stoops* and *Leyse* are distinguishable.  In *Stoops* the plaintiff only used her cell phones to file TCPA lawsuits, whereas here, Dobronski alleges that the calls went to his residential phone line, which he uses to make and receive personal calls.  And *Leyse* was decided after discovery had shown that the plaintiff's investigation of TCPA violations was his primary source of income.  Here, while discovery could potentially place Dobronski in a similar category as the plaintiff in *Leyse*, discovery has not commenced, and taking the present pleadings in the light most favorable to Dobronski, one can reasonably infer that he files TCPA lawsuits to stop intrusions upon his seclusion.[9]

*Second*, Defendants argue that Dobronski gave "implied consent" for all the calls except Call 1.  In support they cite one of Dobronski's other TCPA suits, *Dobronski v. Total Insurance Brokers, LLC*, No. 21-10035, 2021 WL 4452218 (E.D. Mich. Sept. 29,

---

[9] In another Eastern District of Michigan case involving Dobronski, the Court questioned whether *Leyse* is good law because it "require[s] drawing lines regarding when a TCPA plaintiff becomes a 'professional' litigant and loses standing to bring any claims based on alleged violations of the statute," *Dobronski v. Fam. First Life, LLC*, 22-cv-12039, 2024 WL 1342668, at *6 (E.D. Mich. Mar. 29, 2024), yet "there is no 'amateurs only' rule in litigation." *Id.* (quoting *Cunningham v. Rapid Response Monitoring Servs., Inc.*, 251 F. Supp. 3d 1187, 1195 (M.D. Tenn. 2017)).

2021).  There, Dobronski claimed that the defendant was liable for treble damages under the TCPA because it had knowingly and willfully caused telemarketers to make two calls to his phone that violated the statute.  *See id.* at *3.  But his pleadings admitted that he had employed a canary-trap scheme during the first call.  *See id.*  The court reasoned that by "engag[ing] in conduct designed to encourage the second call, [Dobronski] gave implied consent to that call."  *Id.* at *4.  He accordingly failed to plead that the second call was "willful," and thus he could not recover treble damages for that call.  *Id.*  While the holding in *Total Insurance* may help Defendants as to Dobronski's ability to recover *treble damages*, *see infra* at 23, it does not establish that Dobronski suffered *no cognizable injury* under the statute.  Thus, it does not establish that he lacks Article III standing in this case.

*Third*, Omaha points to language from the TCPA discussing "telephone solicitation[s]," which the Act defines as "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services" unless the "the caller has an established business relationship" with the callee.  47 U.S.C. § 227(a)(4).  Omaha argues that when Dobronski feigned interest in its insurance products during Call 1, a business relationship was established.  But Omaha cites no authority recognizing a business-relationship exception to Article III standing, and the contours of any such relationship are better defined after discovery has been completed.

*Finally*, Defendants assert that Dobronski "only alleges one **uninvited** call where [Omaha] was referenced, which does not satisfy the statutory requirement that the person receives more than one telephone call within any 12-month period on behalf of the same entity in order to have a private cause of action."  (ECF No. 21, PageID.269 (emphasis in

13

original); *see also* PageID.385-86).  This language tracks subsection 227(c) of the TCPA, which confers a cause of action to recover for violations of FCC regulations promulgated under its provisions on "[a] person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of [such] regulations." 47 U.S.C. § 227(c)(5).

Defendants effectively argue that Dobronski cannot invoke subsection 227(c)'s cause of action.  But "whether [a plaintiff] has asserted a cause of action depends not on the quality or extent of her injury, as does the inquiry under Article III standing, but on whether the class of litigants of which [she] is a member may use the courts to enforce the right at issue." *Roberts ex rel. Wipfel v. Hamer*, 655 F.3d 578, 581 (6th Cir. 2011) (citation modified).  Thus, the question of whether Dobronski has a cause of action under subsection 227(c) is "a matter of statutory construction, not jurisdiction."[10]  *Id.*

For all of the foregoing reasons, Dobronski has Article III standing.

## B.   Merits Arguments

Defendants also move to dismiss Dobronski's complaint under Fed. R. Civ. P. 12(b)(6) for failure to state a claim for relief.  Such a motion tests a complaint's legal sufficiency.  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

---

[10] Courts often call the question of whether a plaintiff has a cause of action one of "statutory standing." *Roberts*, 655 F.3d at 580. To the extent Omaha argues Dobronski lacks statutory standing to sue under subsection 227(c) of the TCPA, the Court addresses that argument below.

(2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  The plausibility standard "does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct]."  *Twombly*, 550 U.S. at 556.  Put another way, the complaint's allegations "must do more than create speculation or suspicion of a legally cognizable cause of action; they must show *entitlement* to relief."  *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007) (emphasis in original) (citing *Twombly*, 550 U.S. at 555-56).

In deciding whether a plaintiff has set forth a "plausible" claim, the Court must accept the factual allegations in the complaint as true.  *Id.*; *see also Erickson v. Pardus*, 551 U.S. 89, 94 (2007).  That tenet, however, "is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," to prevent a complaint from being dismissed on grounds that it fails to comport sufficiently with basic pleading requirements.  *Iqbal*, 556 U.S. at 678; *see also Twombly*, 550 U.S. at 555; *Howard v. City of Girard, Ohio*, 346 F. App'x 49, 51 (6th Cir. 2009).  Ultimately, "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Iqbal*, 556 U.S. at 679.

When a court is presented with a motion testing the sufficiency of a complaint, "it may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss

so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008).

For the reasons discussed below, while Defendants are correct that Dobronski's claims for treble damages fail as a matter of law, their motions otherwise lack merit.

### i.      The TCPA

Dobronski claims that Defendants violated a laundry list of regulations that the FCC promulgated under subsections 227(b) and (c) of the TCPA.  Many of these regulations apply to residential telephone lines.  A robocall that "constitute[s] telemarketing" generally cannot be made to a residential line "without the prior express written consent of the called party" unless the call "[i]s made for emergency purposes."  47 C.F.R. § 64.1200(a)(3) (2022).[11]  Any call that qualifies as a "telephone solicitation" may generally not be made between 9:00 p.m. and 8:00 a.m.,[12] § 64.1200(c)(1), or to a number listed on the national do-not-call registry,[13] § 64.1200(c)(2).

The FCC's rules further protect residential lines by requiring that any "person or entity" that makes "call[s] for telemarketing purposes" to such a line "institute[] procedures

---

[11] Under Count I Dobronski claims that Calls 1–3 and 6–14 violated § 64.1200(a)(3) "as [Omaha] or [its] agent initiated a telemarketing call to [his] residential line using an automatic dialing system without the prior express consent of the called party and there being no emergency." (FAC ¶ 201.) He alleges that, for the same reasons, those calls also violated §§ 64.1200(a)(1)(iii) and (a)(2). (*Id.*) Subparagraph (a)(1)(iii) of § 64.1200 generally prohibits initiating *any* non-emergency robocall to certain telephone lines (not including residential lines) without the callee's express consent. *See* § 64.1200(a)(1)(iii).  And paragraph (a)(2) of § 64.1200 generally prohibits making non-emergency telemarketing robocalls to the telephone lines listed in subparagraph (a)(1)(iii) of the rule without the callee's express *written* consent. *See* § 64.1200(a)(2).

[12] Under Count VII Dobronski claims that Call 14 violated this rule.

[13] Under Count VI Dobronski claims that all fourteen calls violated this rule.

for maintaining a list of persons who request not to receive telemarketing calls made by or on behalf of that person or entity." § 64.1200(d).  To effectuate this rule, "[p]ersons or entities making calls for telemarketing purposes must have a written policy, available upon demand, for maintaining a do-not-call list." § 64.1200(d)(1).  And such persons or entities "must provide the called party with the name of the individual caller, the name of the person or entity on whose behalf the call is being made, and a telephone number or address at which the person or entity may be contacted."[14]  § 64.1200(d)(4).

The FCC's rules also regulate telemarketing calls regardless of whether the call is made to a residential line.  An "unanswered telemarketing call" must be allowed to ring at least four times or for fifteen seconds, before the call is "[d]isconnect[ed]."[15]  *Id.* § 64.1200(a)(6).  "Any person or entity that engages in telemarketing . . . must transmit caller identification information."[16]  47 C.F.R. § 64.1601(e).  And no "more than three percent of all telemarketing calls that are answered live by a person, as measured over a 30-day period for a single calling campaign," may be "[a]bandon[ed]."[17]  47 C.F.R.

---

[14] Under Count VII Dobronski claims that all fourteen calls were made without a procedure for maintaining a do-not call list.

[15] Under Count II Dobronski claims that Calls 7–9 and 12–14 violated this rule.

[16] Under Count XII Dobronski claims that Calls 1–3 and 5–14 violated this rule. The Court notes a split among judges in this district as to whether this rule was promulgated under subsection 227(c) of the TCPA and whether a private right of action exists to enforce an alleged violation of the rule. *Compare Total Insurance*, 2021 WL 4452218, at *3, and *Dobronski v. Selectquote Ins. Servs.*, 773 F. Supp. 3d 373 (E.D. Mich. 2025).  Because the parties did not directly brief the issue, the Court declines to address it further at this time.

[17] Under this rule a call is abandoned "if it is not connected to a live sales representative within two (2) seconds of the called person's completed greeting." § 64.1200(a)(7). But if "a live sales representative is not available," then an automated "opt-out message" and "opt-out mechanism" must be provided. § 64.1200(a)(7)(i)(A), (B). Under Count III Dobronski claims that Calls 1–3, 6–9, and 11–13 were abandoned. Under Counts IV and V he claims that no opt-out message or

§ 64.1200(a)(7).

Dobronski claims that Calls 1–14 violated some or all of these rules,[18] and that Defendants are responsible for those violations.  And he seeks treble damages, claiming that Defendants' violations were knowing and willful.  But he does not claim that Defendants are responsible for violating any of the TCPA's substantive provisions.

Defendants argue that these claims fail because Dobronski does not plead facts showing that they are liable for the TCPA violations he alleges.  They also argue that Dobronski fails to properly plead any claims for treble damages.

### a.    Liability

In support of its position that it is not liable for any TCPA violations on the face of the complaint, Omaha relies on a 2013 declaratory ruling from the FCC in *In re Joint Petition Filed by Dish Network, LLC* ("*Dish Network*"), 28 FCC Rcd. 6574 (2013).  There, the FCC explained that "a seller is not directly liable for a violation of the TCPA unless it initiates a call, but may be held vicariously liable under federal common law agency principles for a TCPA violation by a third-party telemarketer."  *Id.* at 6582.  Thus, the FCC recognizes that a plaintiff cannot recover against a defendant for a call that violated the TCPA unless the defendant was directly or vicariously responsible for initiating the call.

According to Omaha, *Dish Network* forecloses Dobronski's TCPA claims.[19]  The

---

opt-out mechanism was provided for these calls.

[18] Under Count XI Dobronski claims that all fourteen calls violated § 64.1200(a)(3) and (6) because "[Omaha] or [its] agents failed to maintain a do-not-call list, and record and/or honor [his] do-not-call request." (FAC ¶¶ 237.)

[19] Omaha cites *Dish Network* for the proposition that Dobronski does not plead vicarious liability.

Court is not convinced. *Dish Network* interpreted the TCPA. Under the so-called *Chevron* doctrine, this Court might have been obligated to apply that interpretation if the Act was ambiguous on the issue of liability. *See Chevron, U.S.A., Inc. v, Nat. Res. Def. Council*, 467 U.S. 837 (1984). But *Chevron* was recently overruled in *Loper Bright Enter. v. Raimondo*, 603 U.S. 369 (2024), and this Court must rely on "the traditional tools of statutory construction," and not the FCC, to interpret the Act. *Id.* at 401.

While the Court recognizes that *Dish Network* still might have some persuasive force based on its application of those tools, Omaha does not analyze the case from that angle. In any event Dobronski does not claim that Defendants violated the TCPA's substantive provisions; he claims that they violated various TCPA *regulations*. And the Act does not speak to whether and when a person is liable for violating such regulations; the Act says only that under the right circumstances a plaintiff may recover for such violations. *See* 47 U.S.C. § 227(b)(3), (c)(5). This suggests that Congress delegated to the FCC the responsibility for determining those circumstances. Defendants therefore must explain why, *under the TCPA regulations Dobronski alleges they violated*, he fails to plead a viable theory of liability.

If *Dish Network* had interpreted the regulations at issue here, then this Court might have been obligated to apply that interpretation. That is true because under the right circumstances courts must still apply *Auer v. Robbins*, 519 U.S. 452 (1997), which

---

And Omaha cites a case that applied *Dish Network* in support of its argument that he does not plead direct liability. *See Dobronski v. NPS, Inc.*, No. 356617, 2022 WL 1194212, at *4 (Mich. Ct. App. Apr. 21, 2022).

demands deference to an administrative agency's interpretation of its own, ambiguous rules.  *See Kisor v. Wilkie*, 588 U.S. 558, 573–79 (2019); *United States v. Prather*, 138 F.4th 963, 974 (6th Cir. 2025) ("*Loper Bright* did not overrule *Auer*.").  But Omaha does not explain whether *Auer* deference applies to *Dish Network*.  And it arguably could not, because *Dish Network* purports to interpret the TCPA's text and not any particular TCPA regulation.[20]

Defendants also argue that "one call is insufficient to plead liability under the TCPA."  (ECF No. 21, PageID.279; *see also* ECF No. 29, PageID.385-86).   Under subsection 227(c), "[a] person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under [subsection 227(c)]" may bring "an action based on a violation of [such] regulations."  47 U.S.C. § 227(c)(5).  As such, Dobronski has a cause of action to recover for violations of regulations promulgated under subsection 227(c) if he received at least two calls: (1) "by or on behalf of" Omaha; (3) within the same 12-month period; (3) that violated such regulations.

Defendants focus on the first two elements.   With respect the first element, subsection 227(c) does not define what it means to receive a call "on behalf of" an entity.  The word "behalf" is defined in *Webster's Third New International Dictionary* as meaning "interest" or "benefit," and the phrase "on behalf of" is defined as meaning "in the interest

---

[20] Although *Dish Network* discusses some of the TCPA regulations Dobronski alleges Defendants violated, it does not discuss all those regulations, and, at least on the undeveloped record before the Court, it does not provide an appropriate basis for dismissing any of Dobronski's claims.

of" or "as a representative of." It goes without saying that another common meaning of the phrase is "for the benefit of." The second element is self-explanatory.

Under subsection 227(c)'s plain language, and examining even just the first two calls, Dobronski has a cause of action against Defendants. During Call 1 the caller solicited an Omaha insurance policy. Dobronski feigned interest and gave the name Bruce Carter. Later that day Omaha emailed him an insurance application that was purportedly already e-signed by Bruce Carter even though Dobronski denies doing so. A few days later during Call 2 the caller sought information to finalize Bruce Carter's application. Therefore, Dobronski has adequately alleged that both Calls 1 and 2 were made on behalf of Omaha and were made within the same twelve-month period. This is enough to state a claim for relief under subsection 227(c) against Omaha.

The analysis is slightly different as to Daraujo. Daraujo asserts that "the [FAC] identifies only a single call in which [she] allegedly participated." (ECF No.29, PageID.384-385). As Dobronski explains in his response to her motion, however, "[w]hile it is true that Daraujo directly participated in Call 4 alleged in the FAC, the fact that Daraujo did not directly initiate the calls other than Call 4 does not negate her liability" because she could be vicariously liable for the other calls if Dobronski alleges an agency relationship between her and the other callers. (ECF No. 31, PageID.420) (citing *Gomez v. Campbell-Ewald Co.*, 768 F.3d 871, 879 (9th Cir. 2014) ("a defendant may be held vicariously liable for TCPA violations where the plaintiff establishes an agency relationship, as defined by federal common law, between the defendant and a third-party caller.").

Dobronski adequately alleges facts from which the Court could find that Daraujo is

vicariously liable for the other calls even if she did not make them herself. Specifically, Dobronski alleges that "Daraujo, Omaha, and Doe Telemarketer are engaged in a concerted scheme to market final expense insurance," that "[c]entral to their scheme, Defendant Daraujo and Omaha engage a third-party telemarketer, referenced herein as Doe Telemarketer, to identify and pre-qualify consumers eligible for final expense insurance based upon qualification criteria set by Daraujo and Omaha," that "Daraujo cooperates with the scheme because Doe Telemarketer does all of the work, and Daraujo reaps the benefits of the commissions she receives for the sale of the final expense insurance policies," and that "Daraujo knew (or reasonably should have known) that Doe Telemarketer was sourcing leads in violation of the TCPA and FTSA, but Daraujo failed to take steps to stop it and, instead, engaged in conscious disregard or wilful [sic] blindness to the illegal conduct due to the financial benefits which she reaps from said methods." (FAC ¶¶ 74, 76, 87, 89). Dobronski also alleges that when, on the one call that Daraujo did directly initiate, he "confronted [her] regarding the unwanted telephone solicitation calls," she "first stated that the callers worked for her." (*Id.* ¶ 135). Finally, Dobronski alleges that shortly after Call 1, he "received an email from Omaha with a copy of an insurance application," and that "[t]he email and application named Daraujo as the producing agent." Again, these allegations are sufficient to establish a connection between Daraujo and more calls than just the one she directly initiated herself.

### ii.    Treble Damages

Defendants also argue that Dobronski cannot recover treble damages. In *Total Insurance* the court held that Dobronski could not recover treble damages under the TCPA

for violations of the statute as to calls that he had invited pursuant to a canary-trap scheme. *Total Insurance*, 2021 WL 4452218, at *4. There, the court explained that such damages are available only where a defendant's challenged conduct was "willful," and that because Dobronski "concedes that he engaged in conduct designed to encourage the second call, he gave implied consent to that call," and thus "fails to state a claim that the second call was [] 'willful.'" *Id.*, at *4. In this case, Dobronski admits to giving a false name to the first caller to encourage additional calls" (FAC, ¶ 103), and thus *Total Insurance's* well-reasoned analysis applies equally here. Consequently, Dobronski fails to plead any TCPA claims for treble damages against the Defendants, and his claim for such damages should be dismissed.

### iii. Michigan's Home Solicitation Sales Act (MHSSA)

Section 1c of the MHSSA prohibits certain "unfair or deceptive act[s] or practice[s]" by "telephone solicitor[s]," including a "[f]ail[ure] to comply with the requirements of section 1a or 1b"[21] of the Act. M.C.L. 445.111c(1)(f). Section 1c also states that "[a] person who suffers loss as a result of violation of this section may bring an action to recover actual damages or $250.00, whichever is greater." M.C.L. 445.111c(3). Dobronski claims that Defendants are responsible for various prohibited acts or practices that occurred with respect to all fourteen calls. (FAC ¶ 243).

---

[21] M.C.L. 445.111a prohibits "[a] home solicitation sale [by] telephonic solicitation using in whole or in part a recorded message," while § 445.111b requires persons making telephone solicitations to a residential telephone subscriber to provide certain information "[a]t the beginning of a telephone solicitation," including "his or her name and the full name of the organization [] on whose behalf the call was initiated . . ." M.C.L. §§ 445.111a, b.

Defendants' arguments as to this claim are based on agency liability principles, *i.e.*, that Dobronski failed to plead facts that would establish their respective involvement with, and liability for, the calls. Omaha cites *NPS*, 2022 WL 1194212, which is another case Dobronski brought under both state and federal telemarketing laws. In that case, the Michigan Court of Appeals held that Dobronski's TCPA claims failed because he had not proven that the defendant was liable under the federal common-law agency principles endorsed by *Dish Network*. *See id.* at *4–6. The court also found that this foreclosed the claims Dobronski had brought under the MHSSA because "[a]gency law in Michigan mirrors federal law." *Id.* at *6. At least at this stage of the case, though, *NPS* does not help Defendants because Dobronski's complaint alleges sufficient facts to establish a principal-agent relationship between the Defendants.

Dobronski may recover under the MHSSA for violations of the Act that are properly attributable to Defendants under the federal common-law agency principles discussed in *Dish Network*.[22] The Court has already discussed Dobronski's allegations that speak to Daraujo's agency status, *see supra* at 21-22, so here the Court focuses on the issue from Omaha's perspective. As relevant here, a principal is liable for another's conduct if the other person acted "with apparent authority." Restatement (Third) of Agency § 7.08 (A.L.I. 2006). And a person acts with apparent authority "when a third party reasonably believes the [person] has authority to act on behalf of the principal and that belief is

---

[22] That makes sense because the Act restricts the activities of "telephone solicitors," which the Act defines as "any person doing business in this state who makes *or causes to be made* a telephone solicitation." M.C.L. 445.111(n) (emphasis added).

traceable to the principal's manifestations." *Id.* § 2.03.  As explained by the *NPS* court:

> "Apparent authority is the power held by an agent or other actor to affect a principal's legal relations with third parties when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations." 1 Restatement Agency, 3d, § 203. "The apparent power of an agent is to be determined by the act of the principal and not by the acts of the agent." *Brainard v American Skandia Life Assurance Corp*, 432 F3d 655, 663 (CA 6, 2005) (cleaned up). *Dish Network* provides the following example of circumstances that might impose liability on a seller under a theory of apparent authority:
>
>> [A]pparent authority may be supported by evidence that the seller allows the outside sales entity access to information and systems that normally would be within the seller's exclusive control, including: access to detailed information regarding the nature and pricing of the seller's products and services or to the seller's customer information. The ability by the outside sales entity to enter consumer information into the seller's sales or customer systems, as well as the authority to use the seller's trade name, trademark and service mark may also be relevant. It may also be persuasive that the seller approved, wrote or reviewed the outside entity's telemarketing scripts. Finally, a seller would be responsible under the [Telephone Consumer Protection Act] for the unauthorized conduct of a third-party telemarketer that is otherwise authorized to market on the seller's behalf if the seller knew (or reasonably should have known) that the telemarketer was violating the [Telephone Consumer Protection Act] on the seller's behalf and the seller failed to take effective steps within its power to force the telemarketer to cease that conduct. [*Dish Network*, 28 FCC Rcd at 6592 (footnotes omitted).]

*NPS*, 2022 WL 1194212, at *5.

In his response to Omaha's motion, Dobronski clarifies his position that the calls were made by third-party telemarketers or Daraujo with actual and/or apparent authority traceable to Omaha.  (ECF No. 27, PageID.330-31).  For example, he argues that Omaha "expressly bestowed actual authority upon Daraujo by licensing her as an agent to market

[Omaha's] insurance products."  (*Id.*) (citing FAC ¶ 75) ("Daraujo is an authorized agent of Omaha.").   He also reasonably argues that Omaha "cloaked Daraujo and the telemarketers with apparent authority when [it] sent an email and signed insurance application to Plaintiff's controlled email" less than an hour after Call 1.  (ECF No. 27, PageID.331) (citing FAC ¶ 112) (". . . Plaintiff received an e-mail from Omaha with a copy of an Omaha insurance application.").[23]

Omaha disagrees that Dobronski pleads sufficient facts to establish apparent authority.  Dobronski, Omaha says, alleges no facts showing that it "held out to [him] that any individual defendant was authorized to make calls *in manners [sic] that violated the TCPA or related state statutes*."  (ECF No. 21, PageID.277) (emphasis added).   Thus, Omaha seems to concede that Dobronski adequately pleads that Omaha apparently authorized Daraujo and the other callers *to place calls to him*, but denies that he adequately pleads that it apparently authorized those calls to be made *in ways that violated the MHSSA*.

In response, Dobronski cites another of his past TCPA suits, *Dobronski v. Family First Life, LLC*, No. 22-cv-12039, 2024 WL 1342668 (E.D. Mich. Mar. 29, 2024).  In that case the court applied *Dish Network* to claims Dobronski brought under the TCPA.  *See id.* at *7.  The court concluded that Dobronski had adequately pled that the defendants were responsible for certain telemarketing calls that violated the TCPA on a theory of apparent authority based on two allegations: (1) that the defendants "were each well aware that [a

---

[23] Although Dobronski attached the email to his response brief (and not the FAC), the Court may consider it because it was referenced in the FAC.  (ECF No. 27, PageID.344).  *Bassett*, 528 F.3d at 430.

third-party telemarketer] and its agents engage in illegal telemarketing to sell their respective insurance products"; and (2) that the defendants "nonetheless lent support to the illegal telemarketing activities by giving agents access to their computer systems and the authority to use the company's trademark and service market and by mailing applications and policies to Dobronski after his calls with the agents." *Id.* at *10 (citation modified).

Dobronski makes similar allegations here. For example, he specifically alleges that "Omaha is well aware of the overall scheme, as Omaha has been sued by multiple plaintiffs (including by this Plaintiff) on multiple prior occasions wherein the identical scheme was followed, but Omaha takes no action to curtail the unlawful telemarketing methods or to terminate the producing agents, because Omaha prioritizes reaping insurance premiums over compliance with consumer protection laws." (FAC ¶ 93). And *Dish Network* explained that apparent authority for a TCPA violation by a "seller" may be supported by evidence showing that the seller gave a third-party telemarketer "access to detailed information regarding the nature and pricing of the seller's products and services orto [sic] the seller's customer information" and "[t]he ability . . . to enter consumer information into the seller's sales or customer systems." *Dish Network*, 28 FCC Rcd. at 6592. Dobronski makes allegations along those lines in this case. For example, he alleges, "Omaha further facilitates the scheme by providing Daraujo and Doe Telemarketer with use of Omaha's trademark and access to Omaha's computer systems so that product and pricing information may be provided to the called consumers and the consumer's insurance applications may be completed onto Omaha's application forms and input directly input into Omaha's computer system." (FAC ¶ 91). And he alleges that during Call 11 the caller

stated that he was "with Mutual of Omaha" (*Id.* ¶ 180), and that Calls 1–14 are part of "a concerted scheme" between Omaha and the callers (*id.* ¶ 74).

Thus, just as in *Family First*, the Court finds that Dobronski pleads sufficient facts to state a claim under the MHSSA.

### iv.   Michigan's Telephone Companies as Common Carriers Act (MTCCCA)

Section 25 of the MTCCCA states that "[a] subscriber contacted by a caller in violation of this section may bring an action to recover damages of $1,000.00."  Mich. Comp. Laws § 484.125(5).  And section 25 makes it unlawful to for "[a] caller" to "[d]eliver or attempt to deliver intrastate commercial advertising if the caller activates a feature to block the display of caller identification information that would otherwise be available to the subscriber."  *Id.* § 484.125(2)(b).  Dobronski claims that Defendants did just that for Calls 1–3 and 5–14.  (FAC Count XIV).

Omaha argues that Dobronski's MTCCCA claims fail for the same reason as his MHSSA claims.  Omaha again relies on *NPS*, which held that federal common-law agency principles discussed in *Dish Network* governed MHSSA claims.  But *NPS* did not address the MTCCCA.  And Omaha cites no statutory language or caselaw supporting its view that liability under the MTCCCA is coextensive with liability under *Dish Network*.

Daraujo argues that she cannot be liable under the MTCCCA because the FAC "fails to allege facts showing that [she] is a 'telephone company' or "telecommunications provider' subject to the MTCCCA," and "fails to identify any specific provision of the MTCCCA that [she] allegedly violated . . ."  (ECF No. 29-1, PageID.399).  But, as

Dobronski notes in his response, he brings this claim under Section 484.125(2)(b)[24] of the Act (FAC ¶ 247), and that subsection merely provides that "A caller shall not use a telephone line to contact a subscriber at the subscriber's residence, business, or toll-free telephone number to do either of the following: . . . (b) Deliver or attempt to deliver intrastate commercial advertising if the caller activates a feature to block the display of caller identification information that would otherwise be available to the subscriber." M.C.L. 484.125(2)(b).  The statute contains no requirement that the caller be a "telephone company" or "telecommunications provider."

For these reasons, Dobronski's MTCCCA claims survive Defendants' motions to dismiss.

### v.      Michigan's Consumer Protection Act (MCPA)

The MCPA prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce."  M.C.L. § 445.903(1).  The Act states that "a person who suffers loss as a result of a violation of this act may bring an action to recover actual damages or $250.00, whichever is greater."  M.C.L. § 445.911(2).  In Count XVI of his complaint Dobronski alleges that prohibited methods, acts, or practices occurred with respect to all fourteen calls.

Defendants argue that Dobronski fails to plead a viable theory of liability under the MCPA.  Omaha's challenge fails for the same reasons as its identical challenge to Dobronski's MTCCCA claims; Omaha again relies on *NPS*, which did not discuss the

---

[24] Dobronski's FAC references the proper statute, whereas he mistakenly references an unrelated repealed statute (M.C.L. § 445.125) in his response brief.  (ECF No. 31, PageID.436).

MCPA, and it cites no relevant provisions of the MCPA or any cases interpreting it. (ECF No. 21, PageID.279-80).

Daraujo argues that Dobronski's complaint fails to state a claim under the MCPA because it "does not identify any specific unfair, unconscionable, or deceptive practice engaged in by [her], nor does it allege how [Dobronski] was damaged by such practice. Instead, [Dobronski] offers only conclusory allegations that [she] violated the MCPA, which are insufficient under the Twombly/Iqbal pleading standard." (ECF No. 29-1, PageID.400). Daraujo's argument ignores that the complaint specifies the following ways in which Defendants violated the MCPA:

> representing that a person has approval, status, affiliation or connection that he or she does not have [M.C.L. § 445.903(1)(c)]; making false or misleading statements of fact concerning the reasons for, existence of, or amount of price reductions [M.C.L. § 445.903(1)(i)]; causing confusion or misunderstanding with respect to the authority of a salesperson, representative, or agent to negotiate the final terms of a transaction [M.C.L. § 445.903(1)(m)]; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer [M.C.L. § 445.903(1)(s)]; taking or arranging for a consumer to sign an acknowledgment, certificate, or other writing affirming acceptance, delivery, compliance with a requirement of law, or other performance, if the merchant know or has reason to know that the statement is not true [M.C.L. § 445.903(1)(v)]; making a representation or fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is [M.C.L. § 445.903(1)(bb)]; failing to reveal fact that are material to the transaction in light of representations of fact made in a positive manner [M.C.L. § 445.903(1)(cc)]; and/or, requiring a consumer to disclose his or her Social Security number as a condition to providing a service to the consumer [M.C.L. 445.901(1)(hh)].

(FAC ¶ 254).

For these reasons, Dobronski's MCPA claims survive Defendants' motions to

dismiss.

### vi.    Florida's Telemarketing Sales Act

Section 59 of the FTSA regulates "telephone solicitation" in Florida and states that "[a] called party who is aggrieved by a violation of this section may bring an action to . . . [r]ecover actual damages or $500, whichever is greater." Fla. Stat. § 501.059(10)(a). Under Count XV of Dobronski's complaint he claims that Calls 1–5 violated section 59 of the FTSA in a few ways.[25]  And he claims that he may recover under Florida law because "Murphy participated in Calls 1 through 3[] and Call 5" and "represented that he was located in Florida," and that "Daraujo represented during Call 4 . . . that she was located in Florida."  (*Id.* ¶¶ 249, 250.)  Dobronski also states that he "incorporates" the operative complaint's earlier allegations under Count XV.  (*Id.* ¶ 248.)

According to Omaha, Dobronski fails to plead FTSA claims because the only facts he alleges under Count XV "relate to the actions of . . . Daraujo and an individual by the name of 'Shawn Murphy . . .'"  (ECF No. 21, PageID.280).  But Count XV also incorporates Dobronski's earlier allegations, and as explained above, that includes allegations about how each of the calls was part of a "concerted scheme to market final expense insurance" between Omaha, Daraujo, and the Doe Telemarketer" and that "Omaha further facilitates the scheme by providing Daraujo and Doe Telemarketer with use of Omaha's trademark and access to Omaha's computer systems . . ." (FAC ¶¶ 74, 91), and Omaha does not explain why those allegations fail to state a claim under the FTSA.

---

[25] Specifically, Dobronski claims that Calls 1–5 violated section 59(2), (5), (8)(a), and (8)(b) of the FTSA. *See* Fla. Stat. § 501.059(2), (5), (8)(a), (8)(b).

Daraujo argues that Dobronski's FTSA claims fail because the Act requires the plaintiff to "allege facts showing that: (1) the defendant is a 'commercial telephone seller' or 'salesperson' as defined by the statute; (2) the defendant engaged in telemarketing activities directed at the plaintiff in Florida; (3) the defendant violated specific provisions of the FTSA . . ." (ECF No. 29-1, PageID.401). She goes on to assert that "[Dobronski's] Complaint fails to allege specific facts establishing these elements. The Complaint fails to identify any specific provision of the FTSA that Defendant allegedly violated or how such violation occurred." (*Id.*). These arguments lack merit.

First, contrary to Daraujo's argument, the terms "commercial telephone seller" and "salesperson" are not found in Section 501.059, so an allegation that a defendant is such a person is not an element of a claim under the FTSA. Second, as recently held in *Dobronski v. Tobias & Assocs., Inc.*, 769 F. Supp. 3d 681, 703 (E.D. Mich. 2025), a "[t]elephone call[] may fall within the FTSA's limited scope in two ways: it must be received by a Florida resident or a person in Florida, *or it must be made by an entity in Florida*." *Tobias*, 769 F. Supp. 3d at 703 (emphasis added). Thus, the calls in question did not need to be "directed at" Dobronski "in Florida" to state a claim under the FTSA, and Dobronski specifically limits the alleged FTSA violations to Calls 1-5, as those were the ones that included specific representations by the callers that they were located in Florida. (FAC ¶ 249-50). Finally, Daraujo's assertion that Dobronski "fails to identify any specific provision of the FTSA that [she] allegedly violated or how such violation occurred" is simply incorrect. On the contrary, Dobronski specifies the various subsections of the FTSA that were allegedly violated and the specific ways in which those violations occurred. (*Id.* ¶ 251). For

example, Dobronski asserts that the calls in question violated Section 501.059(2) because "the telephone solicitor made an unsolicited telephonic sales call to a residential telephone number, but failed to identify himself or herself by his or her true first and last names and the business on whose behalf he or she is soliciting immediately upon making contact by telephone . . ." (*Id.*).

For all of these reasons, Dobronski's FTSA claims survive Defendants' motions to dismiss.

## IV.   CONCLUSION

For the reasons stated above, the Court **RECOMMENDS** that Defendants' motions to dismiss **(ECF Nos. 21, 29)** be **GRANTED IN PART AND DENIED IN PART**; specifically, the motions should be **GRANTED** to the extent they seek dismissal of Dobronski's TCPA claims for treble damages, and should be **DENIED** in all other respects.

Dated: December 1, 2025              s/David R. Grand
Ann Arbor, Michigan              DAVID R. GRAND
                                      Omaha States Magistrate Judge

## <u>NOTICE REGARDING OBJECTIONS</u>

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and Fed. R. Civ. P. 72(b)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of HHS*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981).  The filing of objections which

raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *See Willis v. Sec'y of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. L.R. 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on December 1, 2025.

s/Eddrey O. Butts
EDDREY O. BUTTS
Case Manager

34